JOURNAL ENTRY AND OPINION
{¶ 1} Appellant William Ford appeals his convictions for rape, gross sexual imposition, and kidnapping. After a thorough review of the arguments, and for the reasons set forth below, we affirm.
 {¶ 2} On November 23, 2005, the Cuyahoga County Grand Jury returned a 70-count indictment against appellant. He was charged with the following: in Counts 1 through 5, rape, in violation of R.C.2907.02(A)(2); in counts 6 through 35, gross sexual imposition, in violation of R.C. 2907.05(A)(1); and in counts 36 through 70, kidnapping, with sexual motivation specification, in violation of R.C. *Page 3 2905.01(A)(2) and 2941.147. Counts 1 through 5 and 36 through 70 are felonies of the first degree, while counts 6 through 35 are felonies of the fourth degree.
 {¶ 3} On November 30, 2005, appellant was arraigned and a speedy trial hearing was held, with a waiver filed on December 19, 2005. A jury trial commenced on March 13, 2006, and the jury returned a guilty verdict on all counts.
 {¶ 4} On April 26, 2006, a sexual offender classification hearing was held, and appellant was determined to be a sexually oriented offender. On that same date, the trial court imposed a 16-year prison term at Lorain Correctional Institution. Appellant was sentenced to eight years as to counts 1 through 5; one year as to counts 6 through 35; and eight years as to counts 36 through 70. The sentences imposed on counts 1 and 2 were ordered to run consecutively to each other and concurrently to all other counts. Counts 3 through 70 were ordered to be served concurrent to each other and concurrent with the sentences imposed in counts 1 and 2, for an aggregate term of 16 years. The trial court advised appellant about additional punishments for violating the five years of post-release control. On May 30, 2006, appellant filed an appeal from his conviction and sentence.
 {¶ 5} The incidents that gave rise to the charges against appellant occurred between August 2003 and September 2005. The appellant's daughter, *Page 4 
D.S. (DOB: 6/28/1990),[1] alleged that during that time period, appellant sexually abused her. At trial, the state presented seven witnesses. The defense did not present a case.
 {¶ 6} The state's first witness, Morgan Ford ("Ford"), is D.S.'s stepmother. Ford described her relationship with D.S. as a normal teen-mother/stepmother relationship. In 2003, D.S. came to live with Ford and appellant in their apartment approximately one month after the couple married. Previously, D.S. had lived with her mother and other family members in Pittsburgh, Pennsylvania. According to Ford, D.S. visited her mother in Pittsburgh for the summer in 2004 following her arrival in Cleveland; however, the following summer (2005), D.S. was not permitted to visit her mother, use the computer, or talk on the telephone because she had received a "D" in one of her classes.
 {¶ 7} Ford described herself as a light sleeper who had not heard any screams, commotion, or yelling coming from D.S.'s bedroom, despite the fact that the rooms were less than 20 feet apart. By August 2005, Ford, D.S., and Ford's younger daughter, A.F., moved out of the apartment and into Ford's mother's house. It was there that Ford discovered D.S.'s diary. The diary indicated that D.S. was being sexually abused by appellant. Along with her own mother, Ford confronted D.S. about the diary entries. Ford notified the police and provided *Page 5 
them with the diary entries. D.S. then returned to Pittsburgh to live with a cousin.
 {¶ 8} Janice Gassaway, Ford's mother, testified that on October 22, 2005, her daughter showed her D.S. s diary. The diary included two entries indicating that appellant was sexually abusing D.S. According to Gassaway, she and her daughter confronted D.S. and contacted the police.
 {¶ 9} Tierra Reid, D.S. s cousin, testified that she learned of the sexual abuse allegations while visiting family in Cleveland on October 23, 2005. At the family's request, she took D.S. back to Pittsburgh to live with her. On their way, Reid took D.S. to MetroHealth Medical Center for an examination, but no examination took place. On October 25, 2005, Reid and D.S. returned to Cleveland so D.S. could be interviewed by the detective and a social worker. D.S. has been living with Reid in Pittsburgh since October 2005. According to Reid, D.S. is close with a number of family members and never discussed the alleged abuse with any of them.
 {¶ 10} D.S. testified that she was born on June 28, 1990 and that she currently resides with Tierra Reid in Pittsburgh. D.S. s mother, Shelley Schuler, raised her until she was 12, when she became emotionally unable to take care of D.S. D.S. then moved in with other family members in Pittsburgh. In June 2003, D.S. moved to Cleveland to live with her father (appellant) and his wife, *Page 6 
Morgan Ford. They lived in a small apartment where D.S. initially slept on a daybed in the living room. Later, a storage area served as her bedroom.
 {¶ 11} Because Ford attended college night classes, D.S. and A.F. would be home alone with appellant from 6:00 p.m. to 10:00. p.m. According to D.S., appellant began coming into her room at night in August 2003. She said she was awakened by her father's hands underneath her shirt; however, when A.F. and Ford were heard moving about in the apartment, appellant left D.S. s room. D.S. testified that appellant's conduct got more aggressive as time progressed. On another occasion, appellant came into her bed with her and started rubbing her breasts. In September 2003, appellant came into her room and pulled her pants down. He put his penis on her buttocks and began moving in a back and forth motion. After appellant ejaculated, he left the room. Although appellant never put his penis inside D.S. s vagina, he would put his penis and his hand on her vagina. On five different occasions beginning in 2004, appellant placed his fingers in D.S. s vagina.
 {¶ 12} Before she left for her summer visit to Pittsburgh in 2004, D.S. recalled an incident where she awoke completely undressed with her father attempting to have sexual intercourse with her. When she returned to Cleveland that fall, the abuse began again. Despite her attempts to scream and kick her bedroom wall to alert Ford, Ford did not respond. *Page 7 
 {¶ 13} In the fall of 2004, appellant found some money and took D.S. and A.F. shopping and bought them new clothes. That night, he came to D.S. s room again. He turned D.S. on her back, pulled down her pants, and put his penis between her buttocks. He ejaculated and then left the room. D.S. testified that every time appellant did something for her, such as buy her gifts, he would come into her room (either that night or the next night) and sexually abuse her.
 {¶ 14} D.S. testified that she was angry about her punishment for receiving a bad grade at the end of ninth grade (summer 2005). It was during this summer that she began to keep her diary. In addition to her direct testimony regarding the alleged abuse, D.S. was permitted to read an entry from her diary where she wrote, "my dad molesting me." According to D.S.'s testimony, she, Ford, and A.F. moved into Ford's mother's house in October 2005. Upon finding and reading her diary, Ford confronted her about the molestation entries. According to D.S., she was upset, scared, and relieved to learn that Ford was now aware of the abuse.
 {¶ 15} Prior to cross-examination, defense counsel raised the issue of not being granted access to the diary, as required under Crim.R. 16(B)(1)(g). Counsel argued that because the state introduced portions of the diary into evidence, counsel should have been permitted to use the diary in its entirety for cross-examination purposes. Approximately one month before trial, defense counsel had been permitted to look at the document, but was not permitted to *Page 8 
copy it or take notes from it. The state argued that because the document was not prepared in anticipation of trial, and there was no intention to introduce the diary as an exhibit at trial, defense counsel was not entitled to the diary except for the specific entries noting abuse. The trial court conducted an in-camera inspection of the diary and provided defense counsel with five pages. The court ordered all entries sealed for appellate review.
 {¶ 16} D.S. testified that she did not tell Ford about the abuse because she was afraid Ford would not believe her. In addition, she did not confront appellant because she feared how he would react; i.e. choke her or deny it. Appellant would frequently tell D.S. that if she told anyone, he would kill her and that no one would believe her. The abuse continued approximately every other day, except for the weeks she was menstruating. While there were only two entries in the diary regarding the abuse, D.S. estimated she was abused more than 200 times.
 {¶ 17} Cleveland Police Officer Manuel Strefas testified that he responded to the call from Ford on October 23, 2005. After speaking with Ford and D.S., he removed two pages of the diary for evidence. Approximately three and one-half hours later, appellant was arrested.
 {¶ 18} Dana Huddleston-Sanders, a social worker with the Cuyahoga County Department of Children and Family Services, testified that she was assigned the case on October 24, 2005. The following day, she interviewed D.S., *Page 9 
referred her to the Alpha Clinic, and then closed the file because D.S. had moved to Pittsburgh. At the interview, D.S. disclosed incidents of sexual abuse and indicated that appellant was her abuser.
 {¶ 19} Despite defense counsel's objections, Huddleston-Sanders explained the concept of "grooming" to the jury and testified it is common for child abuse victims to not reveal the abuse. According to the witness, grooming involves setting the stage for the abuse to take place. An abuser might provide a victim with gifts so the victim will like the abuser and not report the abuse. Conversely, the abuser might want to scare the victim with threats so the victim will not tell anyone about the abuse.
 {¶ 20} The state's final witness was Detective Harold Thompson of the Cleveland Police Department, Sex Crimes and Child Abuse Unit. Detective Thompson testified that he was assigned to this case on October 24, 2005. He interviewed Ford and also made arrangements to interview D.S. He testified that D.S. was very cooperative and she had brought her diary with her, which was taken into evidence. He also interviewed appellant in the city jail.
 {¶ 21} Appellant brings this appeal asserting six assignments of error for our review.
 {¶ 22} "I. The trial court erred in violation of appellant's due process rights under Article I, Section 10 of the Ohio Constitution and the Sixth Amendment to *Page 10 
the United States Constitution when it denied appellant's counsel full access to the complainant's diary for cross-examination purposes."
 {¶ 23} Appellant contends that the contents of the diary were relevant pursuant to Evid.R. 401 and should have been permitted for use during cross-examination pursuant to Evid.R. 611(B). It is well established that under Evid.R. 104, the introduction of evidence at trial falls within the sound discretion of the trial court. State v. Heinish (1990),50 Ohio St.3d 231; State v. Sibert (1994), 98 Ohio App.3d 412. "The admission or exclusion of evidence rests within the sound discretion of the trial court." State v. Jacks (1989), 63 Ohio App.3d. 200, 207. Therefore, "an appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion." State v. Finnerty (1989),45 Ohio St.3d 104, 107.
 {¶ 24} A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. A reviewing court should not substitute its judgment for that of the trial court. See, generally, State v. Jenkins (1984), 15 Ohio St.3d 164.Finnerty, supra, at 107-108. "An abuse of discretion involves far more than a difference in * * * opinion. The term `discretion' itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an `abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but the perversity of will, not the *Page 11 
exercise of judgment, but the defiance thereof, not the exercise of reason but rather of passion or bias." Huffman v. Hair Surgeon,Inc. (1985), 19 Ohio St.3d 83, 87, quoting, State v. Jenkins (1984),15 Ohio St.3d 164, 222.
 {¶ 25} Appellant contends that because trial counsel was denied access to the diary, he was unable to question D.S. regarding her anger and feelings towards her stepmother and her father's relationship with her stepmother. This contention is without merit. The trial court conducted an in camera review of the diary and required the state to provide to defense counsel those entries that discussed the way the victim felt about her stepmother or any reference to the way she perceived her father. Further, appellant was permitted to explore this dynamic with the victim on cross-examination.
 {¶ 26} Additionally, the state never intended to introduce the diary as evidence because it was a collection of entries discussing her friends, her relationships with boys, and other various activities; all inadmissible or immaterial to the issue at trial. Appellant contends that the diary's contents were relevant; however, he has failed to show how the entries are relevant.
 {¶ 27} Because the state was not required to turn over the diary to appellant, and he was not denied the opportunity to cross-examine the witness, the trial court did not abuse its discretion in denying appellant full access to the diary. Accordingly, the first assignment of error is overruled. *Page 12 
 {¶ 28} "II. Plain error occurred with the admission of other acts testimony in violation of appellant's rights under Article I, Section 16
of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution."
 {¶ 29} Appellant argues that the trial court erred in allowing the testimony of alleged other acts when defense counsel failed to object to testimony by the victim that appellant found money at his place of employment. We note that the appellant failed to object at trial to any of the testimony regarding the above stated evidence; therefore, in the absence of objection, any error is deemed to have been waived unless it constitutes plain error. To constitute plain error, the error must be obvious on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection. See, State v.Tichon (1995), 102 Ohio App.3d 758, 767, 658 N.E.2d 16. Moreover, plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. State v. Waddell (1996), 75 Ohio St.3d 163,166, 661 N.E.2d 1043. Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Phillips (1995), 74 Ohio St.3d 72, 83,656 N.E.2d 643.
 {¶ 30} The law is well settled that evidence of prior bad acts cannot be used to prove character in order to show conduct in conformity therewith. Such evidence is permissible for other purposes, such as to show motive, opportunity, *Page 13 
intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B). Further, "The admission or exclusion of evidence rests within the sound discretion of the trial court."Jacks, supra, at 207.
 {¶ 31} The trial court did not abuse its discretion when it admitted the evidence. The testimony regarding the appellant finding money does not rise to the level of other acts testimony. The testimony did not allege that appellant did anything wrong. It was merely stated that appellant found the money at work. This testimony showed opportunity on behalf of defendant because there was additional testimony that every time the appellant bought the victim something, he would abuse her. Because appellant did not object to the testimony, he cannot now claim that the admission of the testimony was error, unless it was plain error.
 {¶ 32} The trial court did not commit plain error when it admitted the testimony because the testimony did not amount to prior bad acts testimony. Even in the event that there was error, the appellant has not and could not establish that the outcome of the trial clearly would have been different, but for the trial court's allegedly improper actions. It is clear the trial court's actions did not constitute plain error. Accordingly, the appellant's second assignment of error is overruled.
 {¶ 33} "III. Appellant was denied his right to effective assistance of counsel guaranteed by Article I, Section 10 of the Ohio Constitution and the Sixth and *Page 14 Fourteenth Amendments to the United States Constitution when his attorney failed to object to inadmissible other acts testimony."
 {¶ 34} In order to substantiate a claim of ineffective assistance of counsel, the appellant is required to demonstrate that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) the result of the appellant's trial or legal proceeding would have been different had defense counsel provided proper representation.Strickland v. Washington (1984), 466 U.S. 668; State v. Brooks (1986),25 Ohio St.3d 144.
 {¶ 35} In reviewing a claim of ineffective assistance of counsel, it must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. State v. Smith (1985),17 Ohio St.3d 98; Vaughn v. Maxwell (1965), 2 Ohio St.2d 299.
 {¶ 36} With regard to the issue of ineffective assistance of counsel, the Supreme Court of Ohio held in State v. Bradley (1989),42 Ohio St.3d 136:
 {¶ 37} "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant'sSixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness."State v. Lytle (1976), 48 Ohio St.2d 391, 396-397, 2 O.O.3d 495, *Page 15 
498, 358 N.E.2d 623, 627, vacated in part on other grounds (1978),438 U.S. 910. This standard is essentially the same as the one enunciated by the United States Supreme Court in Strickland v. Washington (1984),466 U.S. 668. * * *
 {¶ 38} "Even assuming that counsel's performance was ineffective, this is not sufficient to warrant reversal of a conviction. `An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. United States v. Morrison, 449 U.S. 361, 364-365
(1981).' Strickland, supra, at 691. To warrant reversal, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Strickland, supra, at 694. In adopting this standard, it is important to note that the court specifically rejected lesser standards for demonstrating prejudice. * * *.
 {¶ 39} "Accordingly, to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v.Bradley, supra, at 141, 142.
 {¶ 40} "Trial counsel's failure to make objections are `within the realm of trial tactics' and do not establish ineffective assistance of counsel." State v. Hunt (1984), 20 Ohio App.3d 310, 311. *Page 16 
 {¶ 41} Absent a showing that trial counsel's performance fell below the standard of reasonable professional representation resulting in prejudice to the appellant, there is no claim for ineffective assistance of counsel. Because it must be presumed that an attorney executes his legal duty in an ethical and competent manner, one can assume that trial counsel may have chosen not to object to the testimony because he did not believe it was prior bad acts testimony. Therefore, defense counsel's performance was not seriously flawed nor deficient. Further, had counsel objected to the admission of the testimony, the objection most likely would have been overruled as admissible evidence. Finally, in light of the sufficiency of the other evidence against him, appellant has not shown that he has been prejudiced by such a decision by counsel. The facts of this case do not indicate that the outcome of appellant's trial would have differed, but for defense counsel's actions.
 {¶ 42} Accordingly, appellant's third assignment of error is overruled.
 {¶ 43} Because Assignments of Error IV and V are substantially interrelated, they will be addressed together.
 {¶ 44} "IV. The evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that appellant was guilty of all counts of the indictment because the evidence did not distinguish the multiple allegations of the same type of wrongful conduct. *Page 17 
 {¶ 45} "V. Appellant's convictions were against the manifest weight of the evidence."
 {¶ 46} We find no merit in appellant's argument that his guilty verdict was not supported by sufficient evidence and was against the manifest weight of the evidence.
 {¶ 47} Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486. A conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, citing Jackson v.Virginia (1979), 443 U.S. 307.
 {¶ 48} Where there is substantial evidence upon which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the jury as to the weight and sufficiency of the evidence. State v. Nicely (1988), 39 Ohio St.3d 147. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v. DeHass
(1967), 10 Ohio St.2d 230. On review, the appellate court must determine, after viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259; Jackson v. Virginia (1979),443 U.S. 307.
 {¶ 49} Sufficiency of the evidence is subjected to a different standard than is manifest weight of the evidence. Article IV, Section 3(B)(3) of the Ohio Constitution *Page 18 
authorizes appellate courts to assess the weight of the evidence independently of the fact-finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and the duty to weigh the evidence and determine whether the findings of * * * the trier of fact were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." State ex rel. Squire v. City of Cleveland (1948),150 Ohio St. 303, 345.
 {¶ 50} The United States Supreme Court recognized the distinctions in considering a claim based upon the manifest weight of the evidence as opposed to sufficiency of that evidence. The court held in Tibbs v.Florida (1982), 457 U.S. 31 that, unlike a reversal based upon the insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require special deference accorded verdicts of acquittal, i.e., invocation of the double jeopardy clause as a bar to relitigation. Id. at 43. Upon application of the standards enunciated in Tibbs, the court in State v. Martin (1983),20 Ohio App.3d 172, has set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence. TheMartin court stated:
 {¶ 51} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and *Page 19 
created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Martin at 720.
 {¶ 52} A judgment will not be reversed upon insufficient or conflicting evidence if it is supported by competent, credible evidence that goes to all the essential elements of the case. Cohen v. Lamko
(1984), 10 Ohio St.3d 167, 462 N.E.2d 407. The evidence was legally sufficient in this case. Any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 {¶ 53} Appellant was convicted of rape, in violation of R.C. 2923.23, which reads in pertinent part:
 {¶ 54} "(A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 55} Appellant was convicted of gross sexual imposition, in violation of R.C. 2907.05, which reads in pertinent part:
 {¶ 56} "(A) No person shall have sexual contact with another, not the spouse of the offender;
 {¶ 57} "* * *
 {¶ 58} "(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force." *Page 20 
 {¶ 59} Appellant was convicted of kidnapping, in violation of R.C.2905.01, which reads in pertinent part:
 {¶ 60} "(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 61} "(2) To facilitate the commission of any felony or flight thereafter."
 {¶ 62} Sufficient evidence was introduced at trial to prove the elements of all three crimes. Testimony proved that appellant went into his daughter's room regularly to sexually abuse her. D.S. estimated that appellant abused her over 200 times. She recalled appellant putting his fingers in her vagina five or six times. She testified that appellant climbed on her back, allowed his penis to touch her buttocks, started moving in a back and forth motion, and ejaculated on her. D.S. also testified that while she was in ninth grade, appellant threatened to kill her if she told anyone about his actions and brought something shiny into her room and shook it at her. As time went on, appellant got more mean and more physical with D.S., including shaking or choking her and pushing her head into a pillow.
 {¶ 63} Appellant relies on Valentine v. Konteh (6th
Cir. 2005), 395 F.3d 626 in support of his claim that the evidence was insufficient. Valentine held that due process is violated when a defendant is indicted in a multiple count sex abuse indictment when there is no factual basis or distinction between the *Page 21 
counts. Id. at 633. However, Valentine did not rule out multiple count indictments or impose an overly stringent burden upon the prosecution. "Differentiation is quite possible without exacting specificity." Id. at 637.
 {¶ 64} D.S. testified that appellant put his finger in her vagina on at least five different occasions, supporting the five counts of rape based on digital penetration. In addition, D.S. discussed the frequency of the assaults with incredible analysis. She estimated that appellant abused her over 200 times. She calculated this figure by estimating every other day a week (minus the weeks she menstruated) times two years, and subtracting the three months she was in Pittsburgh.
 {¶ 65} Finally, D.S. testified to a number of specific facts that occurred during the abuse, including incidents with her bra, the incident when the appellant first put his penis on her, the onset of digital penetration in 2004, the threats, the trip to Pittsburgh, the day appellant found money at work, the incident with the shiny object, and her diary. Taking all the evidence in a light most favorable to the prosecution, a rational trier of fact clearly could have found that appellant committed the crimes of rape, gross sexual imposition, and kidnapping.
 {¶ 66} Similarly, when evaluating the evidence presented at trial, it is apparent that the jury's verdict was not against the manifest weight of the evidence. Based on the totality of the testimony by the witnesses, including *Page 22 
D.S., there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proven beyond a reasonable doubt. Accordingly appellant's fourth and fifth assignments are overruled.
 {¶ 67} "VI. The trial court erred in imposing more than the minimum sentence violating appellant's Sixth Amendment rights to have a jury determine any sentence enhancing factors and violating appellant's due process rights."
 {¶ 68} The Ohio Supreme Court's recent decision in State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, renders appellant's assignment of error without merit. In Foster, the Court found several sections of the revised code unconstitutional, including R.C. 2929.14(B), and severed the offending portions from the statutes. As a result, trial courts now have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or state reasons for imposing more than the minimum sentences. Foster, supra.
 {¶ 69} Appellant argues that Foster does not apply to defendants whose alleged criminal conduct pre-dates Foster because it would be a violation of the ex post facto clause. If Foster did not apply to appellant, he would enjoy a presumption of minimum concurrent sentencing. The ex post facto clause of Article 1, Section 10 of the United States Constitution prohibits any legislation that "changes the punishment, and inflicts greater punishment, than the law annexed to the crime, when committed." Miller v. Florida (1987), 482 U.S. 423, *Page 23 
429 quoting Calder v. Bull (1798), 3 Dall. 386, 390. This court recently addressed this issue and, after a thorough analysis of state and federal law, found as follows:
 {¶ 70} "In the instant case, Mallette had notice that the sentencing range was the same at the time he committed the offenses as when he was sentenced. Foster did not judicially increase the range of his sentence, nor did it retroactively apply a new statutory maximum to an earlier committed crime, nor did it create the possibility of consecutive sentences where none existed. As a result, we conclude that the remedial holding of Foster does not violate Mallette's due process rights or the ex post facto principles contained therein." State v. Mallette, Cuyahoga App. No. 87984, 2007-Ohio-715.
 {¶ 71} In the instant case, appellant had notice regarding the sentencing range, which was the same at the time of the offenses as when he was sentenced. Because we find that the holding of Mallette, supra, directly applies to the instant matter, we adopt the Mallette court's holding. We therefore find that the remedial holding of Foster does not violate appellant's due process rights or the ex post facto principles contained therein. Accordingly, appellant's sixth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
 The court finds there were reasonable grounds for this appeal. *Page 24 
 It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, J., CONCURS; KENNETH A. ROCCO, J., DISSENTS (WITH SEPARATE OPINION)
[1] The victim is referred to herein by her initials in accordance with this court's established policy.