[Cite as *State v. Bouyer*, 2023-Ohio-4793.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,         :

                                No. 112045

    v.                          :

JASON BOUYER,                               :

    Defendant-Appellant.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 28, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-647216-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eben McNair, Megan Helton and Caroline Maver, Assistant Prosecuting Attorneys, *for appellee*.

Patituce and Associates, LLP, Megan M. Patituce, and Joseph C. Patituce, *for appellant*.

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant Jason Bouyer ("Bouyer") appeals his convictions for rape and other charges. For the following reasons, we affirm.

## Factual and Procedural History

{¶ 2} In January of 2020, a grand jury indicted Bouyer on twenty-one sex-related charges involving three victims, each related to Bouyer by blood or marriage. The first set of charges pertained to J.D., D.O.B. 12/23/2004, alleging two counts of rape (Counts 7 and 10); one count of attempted rape (Count 3); three counts of kidnapping (Counts 6, 8, and 11); three counts of sexual battery (Counts 4, 9, and 12); three counts of gross sexual imposition (Counts 1, 2, 5); one count of importuning (Count 13); and one count of endangering children (Count 14), for a total of 14 counts. The three counts of kidnapping included sexual motivation specifications and twelve of the counts (Counts 1-12) included sexually violent predator specifications. Counts 1 and 2 were alleged to have occurred between January 1, 2015, and December 31, 2015; Counts 3-6 between January 1, 2016, and November 30, 2016; Counts 7-9 between January 1, 2017, and December 22, 2017; Counts 10-12 between December 23, 2017, and February 28, 2018; Count 13 between May 1, 2018, and June 30, 2018; and Count 14 between January 1, 2015, and February 28, 2018.

{¶ 3} The next set of charges pertained to T.W., D.O.B. 2/29/2000, alleging two counts of gross sexual imposition (Counts 15 and 16). The final set of charges pertained to M.B., D.O.B. 5/25/2004, and alleged three counts of gross sexual imposition (Counts 18-20), one count of soliciting (Count 17), and one count of disseminating matters harmful to a juvenile (Count 21). Count 15 was alleged to

have occurred between June 1, 2011, and August 31, 2011;[1] Count 16 on March 1, 2016; Count 17 between December 1, 2015, and May 1, 2018; and Counts 18-21 between May 1, 2018, and November 18, 2019.

{¶ 4} The allegations surfaced in May 2019 after J.D. disclosed to two of her family members that Bouyer had sexually assaulted her. J.D. became upset while attending a family function at her paternal grandparents' home. When her aunt, B.D., and her cousin, K.D., tried to find out what was wrong, J.D. broke down. At the time, J.D. was not able to verbalize exactly what happened, but through questions and hand gestures, B.D. and K.D. learned that Bouyer had sexually assaulted her.

{¶ 5} On the way home, K.D. told her mother, J.W., about the conversation with J.D. J.W. decided they needed to talk to J.D.'s father, Manny. The following day, they went to Manny's house. J.W. went to the garage to talk to her brother, while K.D. went inside to talk to J.D. J.W. did not go into detail with her brother but told him that something was happening to J.D. and that he needed to talk to her. J.D. eventually talked to her father and explained, without a lot of detail, what happened. The following day, he took her to file a police report.

{¶ 6} At trial, J.D. testified that her mother, N.B., met Bouyer in approximately 2010 and married him in 2015. J.D.'s relationship with her mother changed after she met Bouyer. Before, J.D. felt she could confide in her mother.

---

[1] The indictment originally alleged this crime occurred between July 1, 2014, and July 31, 2014. On February 15, 2022, the state moved to amend the indictment based on further conversations with T.W., which the trial court granted.

Afterward, J.D. felt her mother told Bouyer everything that J.D. discussed with her. Additionally, when Bouyer and N.B. started dating, N.B. would disappear. J.D. would have to stay with anyone who would take her because N.B. was not around.

{¶ 7} Beginning in 2014, J.D. was in therapy, primarily to address the absence of her biological father. Her therapy sessions were not entirely confidential. Her mother and Bouyer would meet with the therapist to discuss issues J.D. raised during sessions. As a result, J.D. did not feel she could confide in her therapist.

{¶ 8} The first time Bouyer touched her inappropriately they were wrestling. At the time, Bouyer, N.B., J.D., and M.B. were living together at a house on Gramatan in the city of Cleveland. They would all play wrestle with one another. Sometime after N.B. and Bouyer got married in May 2015, and around the time J.D. turned 10 or 11, while wrestling Bouyer touched J.D. on her vagina over her clothes. J.D. froze. She was not sure if it was accidental or purposeful. However, she remembered that his hand stayed on her vagina and that he moved his fingers against her.

{¶ 9} It happened again in Bouyer's bedroom, after her 11th birthday. Her mother had just left for work. In those days, her mother worked at bars, usually in the evenings, between 5:00 p.m. and 3:00 a.m. While they were wrestling, Bouyer's bare hand moved inside her pants and touched her vagina, bare skin to bare skin. She froze again. She began to realize his actions were intentional.

{¶ 10} There were times when J.D. and Bouyer had a good relationship. Her biological father was not always around and J.D. struggled with his absence. As a

result, she would talk to Bouyer. There was a time however when those conversations turned to "gross" things. When asked what "gross" meant, J.D. indicated sexual things. During one of those conversations in his bedroom, J.D. ended up lying on the bed. She remembered Bouyer grabbed a condom, put it on, and told her to pull down her pants. He pressed his penis to the outside of her vagina, skin to skin. She felt pressure and pain and told him to stop, which he did. She got up, got dressed, and went downstairs. This incident happened sometime in 2016, the year J.D. turned 12.

{¶ 11} Another time, J.D. was in her bedroom in the basement talking with Bouyer at the Gramatan house. The conversation turned to sexual things. J.D. initially testified that they were talking about her boyfriend, whom she started dating on December 14, 2017. However, she later testified that this incident happened in August 2017. It happened at night, after her mother went to work, while M.B. was upstairs. Bouyer asked her to "give him head." When asked what that meant, J.D. testified it involved her mouth on his penis. She did not feel like she could say no because she was afraid of him. She complied and during the act, Bouyer instructed her how to perform. She remembered that he moved her head aside before he ejaculated. He used his shirt to clean himself up.

{¶ 12} A second incident of fellatio occurred while the two were in the bedroom Bouyer shared with N.B. Bouyer again instructed her how to perform and moved her head aside before he ejaculated. J.D. dated this incident in February 2018 at the Gramatan house. J.D. never told her mother what happened because

she feared her mother would tell Bouyer. She was afraid that her mother would not do anything, that she, J.D., would get in trouble, or something worse.

{¶ 13} When Bouyer asked her a third time for oral sex, she refused. The next day, she randomly got in trouble, which she believed happened, in part, because she said no. This incident occurred sometime after the family moved to a home on Parkridge in the spring 2018.

{¶ 14} J.D. disclosed the abuse to her boyfriend J.B. over the phone. He advised her to tell someone. She told him she did not know how to tell anyone and that she was scared. K.D. and B.D. testified regarding J.D.s disclosure to them of the sexual abuse. J.W. testified regarding the subsequent conversation with Manny. Manny testified to his conversations with his sister J.W. and then J.D.'s disclosure to him about what happened. J.B. testified about his conversation with J.D.

{¶ 15} The police, in the course of the investigation, interviewed T.W. T.W. would sometimes babysit J.D. and M.B. The first time Bouyer touched T.W., she was 11 years old. She remembered being at the Gramatan house and standing by the door, waiting for some friends. It was around June or July 2011. She was looking outside for her friends when Bouyer came up behind her and "caressed" her butt. He did not grab her but placed his hand on her butt and moved his hand back and forth against her. While doing this, Bouyer commented that T.W.'s body was better than her sister's.

{¶ 16} The second incident T.W. remembered occurred at her 16th birthday party in 2016. To symbolize the change from child to woman, she had

choreographed a dance where the long skirt she was wearing would unwrap to reveal a short skirt. Her father was supposed to dance with her, but they had a fight and T.W. wanted someone else to take over for him. From her recollection, Bouyer volunteered and she agreed. After the dance, Bouyer grabbed her by the hips and pumped his pelvis against her butt. He did not grind against her but she was able to feel his penis. He mentioned at the time that she was finally 16, the age of consent. He had previously told her that the age of consent was 16. Both J.D. and M.B. testified that Bouyer made similar comments to them, to remind them that the age of consent was 16.

{¶ 17} Manny testified to a set of text messages he saw on J.D.'s phone while they were on a family trip to Puerto Rico in 2017. In one of the texts, J.D. wrote "Sneak out and go clubbing lol." Bouyer responded, "We going to be in the club when you turn 16. Popping bottles." These text messages were preserved in evidence and presented at trial. Manny told J.D.'s mother, N.B., about the texts because he felt the communication between Bouyer and J.D. was inappropriate. To Manny's knowledge, N.B. did not act on the texts. Afterward, Manny was not able to see J.D. for six or seven months. He believed that Bouyer and N.B. kept J.D. from him. He was able to resume contact by going to court.

{¶ 18} During the trial, the state called Shannon Hanrahan ("Hanrahan"). Hanrahan was an intake worker with the Sexual Abuse Unit at the Cuyahoga County Division of Children and Family Services. She was assigned to M.B.'s case and conducted a recorded interview with her in November 2019. Hanrahan testified that

the purpose of the interview was to gauge M.B.'s safety and investigate her allegations. The state played the beginning of the video and asked Hanrahan to identify it. At the 18-second mark in the video, the defense requested a sidebar and objected to the introduction of the video. The state argued that they were permitted to introduce the interview because it was conducted to assess M.B.'s safety, her need for medical treatment and diagnosis as well as any mental health referrals that might be needed. The trial court overruled the objection. Midway through the video, the defense objected again. After ascertaining that M.B. was going to testify, the defense withdrew its objection.

{¶ 19} At completion of the video, the trial adjourned for the day. The following morning, the defense renewed its objection to the video arguing that it was mostly testimonial and that the state improperly introduced the evidence. The defense opined that the state should have filed a motion in limine prior to trial to allow the court to determine what information was testimonial and what information could be properly presented to the jury. The trial court elected to table the objection until M.B. testified. The defense then moved for a mistrial, which the trial court denied. After a weekend break, the defense filed a formal motion and requested a mistrial. After hearing arguments of counsel, the trial court denied the motion.

{¶ 20} Bouyer's daughter, M.B., remained in the home after J.D. disclosed the sexual abuse. M.B. was not informed of all the details but knew allegations were made. In November 2019, M.B. texted J.D. from a cell phone she received from her

mother. Both M.B. and J.D. testified that Bouyer and N.B. were very strict about phone usage. Every night they were required to place their phones on the kitchen counter. One to two weeks prior to M.B. reaching out to J.D., her phone was taken, as punishment. Subsequently, M.B. ran away from home. She eventually returned home and her mother brought her a cell phone at her school.

{¶ 21} Bouyer learned that M.B. had a phone, and as a punishment, removed most of her clothes and other personal items from her room. Shortly thereafter, M.B. contacted her mother and they went together to the police. M.B. reported to the police that she had been touched by her father and that she received texts from him. In the texts, Bouyer asked M.B. to perform sexual acts with him for cash. M.B. testified to three incidents, all at the Parkridge home. One where Bouyer touched her butt while she was washing dishes; a time when his penis touched her vagina while they were wrestling; and a time when Bouyer texted her a sexually graphic picture/video. M.B. testified that when she got her phone in the morning, texts from Bouyer were deleted.

{¶ 22} After the state rested its case, the defense renewed its objection to the admission of exhibit No. 11, M.B.'s interview. The trial court sustained the objection and agreed to issue a limiting instruction. The court refused to declare a mistrial, finding that M.B.'s interview did not rise to the level of prejudice necessary to require a new trial and noting that the defense had an opportunity to cross-examine the witness.

{¶ 23} The defense then began its case in chief by calling N.B. to the stand. N.B. testified that she, Bouyer, J.D., and M.B. moved into the Gramatan home in September 2011. She and Bouyer started dating the year prior, about April 2010. However, during the summer 2011, N.B. indicated she and Bouyer had broken up. They broke up in March 2011 and got back together about six months later. Per N.B., T.W. did not start babysitting J.D. and M.B. until 2014 or 2015.

{¶ 24} The first time N.B. became aware of J.D.'s accusations was at the police station. Manny called her and told her to meet them at the station, which she did. N.B. did not believe J.D.; she thought Manny was behind the allegations. N.B. testified that during the trip to Puerto Rico, J.D. became upset because Manny accused Bouyer of molesting her. Per N.B., J.D. stopped seeing her father because she was upset about the allegations. After J.D. made her allegations, N.B. was angry but said that she did not choose a side.

{¶ 25} On cross-examination, N.B. admitted that she told J.D. in text messages that they had to get rid of her dogs because she went to the police. The state also introduced several telephone conversations between Bouyer and N.B. recorded while he was in custody. In an effort to refresh her recollection, the state asked N.B. whether she remembered making certain statements during the calls. When she indicated she did not remember, the state played some recordings in open court before the jury to refresh her recollection. Through these recordings, which were not introduced into evidence, the state introduced statements by N.B. that she wanted to confront J.D. and that it disgusted her to be in front of J.D.

{¶ 26} Prior to resting, the parties discussed a curative instruction for M.B.'s interview. In sum, the court would advise the jury that they were not to consider the interview in their deliberations. The defense did not object to the instruction or suggest an alternative instruction when prompted by the court.

{¶ 27} The instruction given to the jury was as follows:

An interview dated November 19, 2019, of [M.B.], at the Child Advocacy Center was played for you in court. You are instructed not to consider any statements in this interview for any purpose.

{¶ 28} The trial court provided the parties with a copy of the proposed jury instructions and the verdict forms. Both parties raised suggestions to the jury instructions. Neither party objected to the verdict forms.

{¶ 29} The jury found Bouyer guilty as charged on Counts 1-14, pertaining to J.D., guilty of Count 15, pertaining to T.W., and guilty of Counts 18 and 20 pertaining to M.B. The jury found Bouyer not guilty of Count 16, gross sexual imposition of T.W., Count 17, soliciting M.B., Count 19, gross sexual imposition of M.B., and Count 21 disseminating matter harmful to juvenile, M.B.

{¶ 30} After the verdict, the trial court addressed the sexually violent predator specifications, which were bifurcated from the jury. Without an additional hearing, and without objection, the court found Bouyer guilty of all 12 sexually violent predator specifications associated with Counts 1-12.

{¶ 31} Bouyer appeals assigning the following errors for our review:

## **Assignment of Error No. 1**

The state's failure to provide a meaningful bill of particulars deprived Mr. Bouyer, as a matter of law, of his constitutionally guaranteed rights under both the United States and Ohio Constitutions.

## **Assignment of Error No. 2**

Appellant was denied his right to a fair trial when the trial court failed to declare a mistrial after the state played a video, in full, containing reprehensible and shocking allegations that were so lacking in relevance that the trial court struck it in its entirety.

## **Assignment of Error No. 3**

Plain error exists in jury verdict forms when the forms improperly interlace and reference, other counts as being charged conduct.

## **Assignment of Error No. 4**

Appellant was deprived of his right to a fair trial when improper victim impact testimony was admitted without relevance and lacked probative value.

## **Assignment of Error No. 5**

The trial court erred when it permitted the state to improperly admit recorded phone calls for the purpose of introducing those recorded statements for the truth of the matter asserted under the guise of recollection refreshed.

## **Assignment of Error No. 6**

Appellant was denied his right to a fair trial when witnesses were permitted to testify to their belief as to the truthfulness of the purported victim in this case.

## **Assignment of Error No. 7**

The state failed to present sufficient evidence to sustain a conviction as to Count four: sexual battery.

<u>**Assignment of Error No. 8**</u>

The trial court erred in finding appellant guilty of the sexually violent predator specification where it failed to hold a hearing on the matter and the state failed to present any evidence to support the finding.

<u>**Law and Analysis**</u>

<u>**Sixth Amendment Right to Know the Nature of the Accusations**</u>

{¶ 32} In the first assignment of error, Bouyer argues that the state's failure to provide a meaningful bill of particulars deprived him of his rights under the Sixth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution. Bouyer's specific concern was that the discovery provided by the state pointed to numerous incidents; however, the state had elected to indict him for a select few charges. Bouyer alleges he had not received enough information from the state to determine the nature and time frame of the alleged conduct to effectively challenge the allegations in court.

{¶ 33} Both the Ohio and United States Constitutions entitle a person charged with a felony to an indictment "setting forth the 'nature and cause of the accusation.'" *State v. Sellards*, 17 Ohio St.3d 169, 170, 478 N.E.2d 781 (1985) quoting Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution. An indictment serves a dual purpose: (1) by requiring the government to aver all material facts constituting the essential elements of an offense, an accused is afforded with adequate notice and an opportunity to be heard; and (2) when an indictment identifies and defines the

offense, it enables the accused to protect himself from any future prosecutions for the same offense. *Id.*

{¶ 34} Even so, a defendant may seek more specificity by requesting a bill of particulars. When a defendant makes a written request for a bill of particulars, the prosecution "shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charged and of the conduct of the defendant alleged to constitute the offense." Crim.R. 7(E); R.C. 2941.07. However, the bill of particulars has the limited purpose of particularizing the conduct of the defendant that is alleged to constitute the offense. *Sellards* at 171. It is not intended to provide the defendant with evidence specifications nor to replace discovery. *Id.*, citing *State v Wilson*, 29 Ohio St.2d 203, 280 N.E. 2d 915 (1972).

{¶ 35} Ordinarily, the dates and/or times of offenses are not required to be included in a bill of particulars because it focuses on the alleged conduct of the accused. Generally, the dates and times are irrelevant to the preparation of the defense. *Id., citing State v. Gingell*, 7 Ohio App.3d 364, 367, 455 N.E.2d 1066 (1st Dist.1982). Regardless, if the state possesses specific dates and times of events, it must be provided through discovery, and when requested, through the bill of particulars. *Id.*

{¶ 36} Where, as here, a defendant seeks reversal of his convictions based on an insufficient bill of particulars, he must show that his lack of knowledge of facts that should have been included in a bill of particulars prejudiced him from properly

defending himself. *State v. Yerena*, 6th Dist. Ottawa No. OT-15-049, 2016-Ohio-7635, ¶ 11, citing *State v. Chinn*, 85 Ohio St.3d 548, 569, 709 N.E.2d 1166 (1999).

{¶ 37} In this case, the indictment itself provided details of Bouyer's alleged conduct, for instance specifying under the clothes versus over the clothes. Counts 1, 2, 3, 5, 10, 15, 16, 18, 19, and 20 contained such additional information. The remaining charges tracked the language of the applicable statutes.

{¶ 38} The state filed three bills of particulars in response to Bouyer's motions. The first bill of particulars, filed January 27, 2020, tracked the indictment in its language and added addresses where the offenses occurred.

{¶ 39} On July 1, 2020, the state attached a bill of particulars to a supplemental discovery response. In it, the state included information that Count 3, attempted rape, occurred "before summer 2016"; Counts 7-9, rape, kidnapping, and sexual battery "victim disclosed August 2017 as one date"; Counts 10-12, rape kidnapping, sexual battery, "child specifically mentioned February 2018 per police report."

{¶ 40} The state filed a subsequent supplemental discovery response on July 10, 2020, with an attached bill of particulars. In it, the state clarified that Counts 3-6 included similar incidents that occurred before the summer 2016, during the summer 2016, and after the summer 2016; Counts 7-9 occurred after school started, around August 2017; Counts 10-12, "victim believes it occurred in this period and told her boyfriend about it in February 2018"; Count 13, "in the new

house," i.e., Parkridge; Count 14, "old house," i.e., Gramatan; Count 18, "on skin"; and Count 19, "on clothing."

{¶ 41} The defense subsequently filed another motion for bill of particulars and requested the exclusion of other acts evidence on August 23, 2021. The state responded, opposing the motion, on September 10, 2021, and summarized the counts as follows:

**Counts 1 – 12 and Counts 14-17**

Location: Gramatan Avenue House

Indictment and/or BOP and/or discovery has provided specificity as to the offenses alleged in Counts 1, 2, 3, 5, 7, 10, 15, 16

Count 4:     Alternative to Count 3, 5

Count 6:     Pairs with Counts 3, 4, 5

Count 8:     Pairs with Count 7

Count 9:     Alternative to Count 7

Count 11:     Pairs with Count 10

Count 12:     Alternative to Count 10 (offense: fellatio)

Count 14:     Additional specificity: comments made by defendant such as how he cannot wait until [J.D.] is 16 and can have sex, conversations about sex, conversation about victim doing things sexually with her boyfriend, and then with him (this information provided via discovery)

Count 17:     Defendant would text [M.B.] that she should meet him in the shower and give him a hand job or suck him for money. Defendant would text her in old house too. When they moved he started again with such texts as "You make me hard. You make me horny." (this information is included in the discovery already provided.)

| [Note]: | [J.D. and T.W.] have reported similar comments and this information is in grand jury transcript provided by the court (10/15/2019, p. 4, 9) as well as in police reports. |

## Count 13 and Counts 18-21

| Location: | Parkridge address |
| --- | --- |
| Count 13: | Asks victim to perform fellatio; victim refuses |
| Counts 18, 19, 20: | Indictment and BOP each provide specificity to differentiate the offenses (on skin, over clothes) |
| Count 21: | Victim described defendant showing her a picture or video involving two adult females and one adult male engaged in sexual conduct. One female was licking the other female while a penis is in the female's mouth. |

{¶ 42} This court has noted that in cases where the allegations involve sexual misconduct with a child, "precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity." *State v. Hemphill*, 8th Dist. Cuyahoga No. 85431, 2005-Ohio-3726, ¶ 54. Nevertheless, we must balance this reality with the defendant's Sixth Amendment right to know the nature and cause of an action, including information concerning all the elements of the offenses charged. *Id.* at ¶ 55. In addition, the indictment should provide enough information for the trial court to determine whether the evidence presented is sufficient to support a conviction. *Id.*, citing *United States v. Landham*, 251 F.3d 1072 (6th Cir. 2000).

{¶ 43} In the instant case, with the exception of T.W. who was able to identify an incident that happened at her sweet 16 birthday party, the state was limited to the information its young victims were able to provide. The record reflects that the

state narrowed the time frames as much as possible. Bouyer, however, argues that it was inadequate.

{¶ 44} Bouyer cites to *Hemphill* in support of his argument that the state did not provide sufficient specificity in its indictment and its subsequent bills of particulars. However, *Hemphill* and the line of cases cited in it, are distinguishable from the facts of this case. In *Hemphill,* the defendant was charged with 33 counts each of rape, kidnapping, and gross sexual imposition for a total of 99 counts. Ultimately, the victim provided vague testimony indicating that she was assaulted "at least" 33 times. The court of appeals overturned the majority of the convictions noting, "Although we can appreciate the difficulty of prosecuting a case involving a reticent victim who appears to be unsupported by her family, this cannot lessen the state's burden of proof as to each individual offense." The court found that it could not accept the "numerical estimate" of offenses when it was unconnected to individual, distinguishable incidents of criminal conduct.

{¶ 45} In the instant case, the state gave Bouyer information about all the allegations the victims made against him. However, the state did not indict all the incidents. From our review of the record, the state's indictment included the charges on which they were able to obtain the most information. Except for T.W., none of the victims stated the exact date the incidents occurred. The bills of particulars provided reference points to when the incidents happened. At trial, the state addressed the victims to: (1) prevent testimony on acts not included in the indictment, and (2) focus on the specific incident and when it likely happened.

There was no evidence that the state possessed specific dates or times that incidents occurred, or that specific dates were discernable, given the nature of Bouyer's alleged conduct.

{¶ 46} Furthermore, Bouyer focuses in his brief on how the bills of particulars were confusing but does not establish how he was prejudiced by them beyond general allegations that he was prevented from mounting a defense. Nowhere in his brief does he establish that "lack of knowledge concerning specific facts a bill of particulars would have provided him actually prejudiced him in his ability to fairly defend himself." *Chinn*, 85 Ohio St.3d at 569, 709 N.E.2d 1166. The only incident during the course of the trial that was of concern occurred with respect to Counts 3-6. These counts addressed the same conduct; however, the bill of particulars indicated the time frame was either before the summer 2016, during the summer 2016 or after the summer 2016, three separate incidents. An earlier bill of particulars selected the first incident, which was prior to the summer 2016. At trial, the state acknowledged that it could not proceed on all three and elected the first incident, the one that occurred prior to the summer 2016. J.D. only testified regarding that incident.

{¶ 47} Nevertheless, Bouyer has not demonstrated how his defense would have changed had he known that information earlier. In order to be entitled to a reversal of his convictions, Bouyer must establish that he was prejudiced by information he should have received in a bill of particulars. *Yerena*, 6th Dist. Ottawa No. OT-15-049, 2016-Ohio-7635, ¶ 11, citing *Chinn* at 569. He has failed to do so.

{¶ 48} Bouyer's defense centered on his denial of the allegations. He also suggested that the victims were lying: J.D. and M.B. in order to live with less strict parents and T.W. for reasons that were not made clear on the record. A defendant's due process rights are not violated when he is convicted of a multicount indictment where he "denied any sexual contact whatsoever with the victims and, therefore, the lack of specificity in the indictments as to specific dates or place of the alleged abuse did not result in prejudice to the defendants' defense." *State v. Czech*, 8th Dist. Cuyahoga No. 100900, 2015-Ohio-1536, ¶ 21. *See also State v. Yaacov*, 8th Dist. Cuyahoga No. 86674, 2006-Ohio-5321; *State v. Ford*, 8th Dist. Cuyahoga No. 88236, 2007-Ohio-2645. Absent a showing of prejudice, Bouyer has failed to establish that any fault with the bills of particulars warrant reversal of his convictions.

{¶ 49} Finally, Bouyer argues that the bill of particulars did not provide sufficient information on the sexual motivation or sexually violent predator specifications. A "sexual motivation" means "a purpose to gratify the sexual needs or desires of the offender." R.C. 2971.01(J). A "sexually violent predator" is someone who "commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). A "violent sex offense" includes "a violation of section 2907.02, 2907.03, 2907.12 or of division (A)(4) or (B) of section 2907.05 of Revised Code" or an attempt to commit or complicity in committing one those offenses. R.C. 2971.01(L)(1) and (3). A person is likely to engage in the future in one or more sexually violent offenses if "[a]vailable

information or evidence suggests that the person chronically commits offenses with a sexual motivation." R.C. 2971.01(H)(2)(c).

{¶ 50} While the state's bills of particulars did not directly address the sexual motivation specifications or the sexually violent predator specifications, it detailed the conduct, the number of victims, and multiple sex-based offenses against minors. Bouyer was accused of rape, attempted rape, sexual battery, and gross sexual imposition under R.C. 2907.05(A)(4), all violent sexual offenses by definition. R.C. 2971.01(L)(1) and (3). Each of the three kidnapping charges with sexual motivation specifications were attached to the allegations of sexual assault. The state provided sufficient information to allow Bouyer to discern the nature of the conduct he was accused of committing.

{¶ 51} Additionally, Bouyer has again failed to establish that he was prejudiced or what facts missing from a bill of particulars prejudiced his defense.

{¶ 52} Accordingly, the first assignment of error is overruled.

**Mistrial Based on the Erroneous Admission of Evidence**

{¶ 53} In the second assignment of error, Bouyer alleges that he was denied the right to a fair trial when the trial court failed to declare a mistrial after the state played a video interview with M.B. in open court before the jury. The state played the video early in the trial; however, the trial court did not rule it inadmissible until after the state rested its case. Specifically, Bouyer alleges that the interview contained testimony that constituted improper hearsay; bolstering; victim-impact; and impermissible Evid.R. 404(B) evidence.

**Standard of Review**

{¶ 54} The decision to grant or deny a motion for mistrial lies within the sound discretion of the trial court. *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995). Furthermore, a trial court holds broad discretion when deciding whether to admit or exclude evidence. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). An appellate court will not disturb such "exercise of discretion absent a showing that the accused has suffered material prejudice." *State v. Miller*, 8th Dist. Cuyahoga No. 100461, 2014-Ohio-3907, ¶ 36, citing *Sage* at 182. An abuse of discretion occurs when a trial court's decision is "unreasonable, arbitrary, or unconscionable." *State v. Hill*, Slip Opinion No. 2022-Ohio-4544, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A mistrial should only be granted when "the ends of justice so require and a fair trial is no longer possible." *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶ 55} A mistrial based on erroneously admitted evidence is appropriate when that evidence is "of an exceptionally prejudicial character such that its withdrawal from consideration by the jury cannot be expected to remove the harm." *State v. Marshall*, 2014-Ohio-4677, 22 N.E.3d 207, ¶ 29 (8th Dist.), quoting *United States v. Carr*, 5 F.3d 986, 993 (6th Cir.1993).

{¶ 56} Here, the state argued that M.B.'s interview was entirely admissible, while the defense argued that it was inadmissible and highly prejudicial. Additionally, throughout the case, the defense attempted to limit the testimony to

only address the specific acts the state had charged. Nevertheless, the defense did not object to the admission of other acts testimony when it first objected to the video. They did not raise other acts until after the video finished playing. The trial court elected to wait until M.B. testified before ruling on the defense motion. Upon learning that Det. Saffo relied on the videotaped interview and never spoke to M.B. and after hearing M.B.'s testimony, the trial court found the video inadmissible and noted that it contained other acts evidence. However, the trial court denied the defense's motion for a mistrial finding that the evidence was not prejudicial enough to warrant that remedy. Finally, the trial court administered a curative instruction.

{¶ 57} A curative instruction is generally an effective way to remedy any errors or irregularities that occur during trial. *State v. Williams*, 8th Dist. Cuyahoga No. 94242, 2010-Ohio-5484, ¶ 21 citing *State v. Zuern*, 32 Ohio St.3d 56, 61, 512 N.E.2d 585 (1987). "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *Id.*, citing *State v. Henderson*, 39 Ohio St.3d 24, 33, 528 N.E.2d 1237 (1988).

{¶ 58} Hanrahan's conversation with M.B. was the first interview with M.B. on these charges. Accordingly, it was wide ranging and included background information regarding the family dynamics. M.B. disclosed multiple incidents of solicitation for sex, alleging that Bouyer would text her daily and that it lasted 3-4 months. She also disclosed that Bouyer touched her inappropriately multiple times, the most recent being the weekend before the interview. M.B. also told Hanrahan

that she believed J.D. She didn't want to believe Bouyer had raped J.D., but otherwise she didn't doubt J.D.

{¶ 59} The defense had an opportunity to cross-examine M.B. addressing the fact that she chafed at the restrictions in Bouyer's home. The defense was also able to elicit testimony that M.B. wanted to move in with her mother but Bouyer would not let her. Similarly, while M.B. indicated in her interview that she believed J.D., she also indicated that she did not know the details of the allegations.

{¶ 60} Given the foregoing, we agree with the trial court that, although it was error to allow the jury to see M.B.'s interview, it did not warrant a mistrial. Accordingly, the trial court did not abuse its discretion when it allowed the video to be viewed nor when it denied the defense motion for mistrial.

**Verdict Forms**

{¶ 61} In the third assignment of error, Bouyer argues that the verdict forms for Counts 4-6, 8-9, and 11-12 were "so confusing as to arise to the level of plain error." Bouyer suggests the remedy is that this court vacate those counts.

**Standard of Review**

{¶ 62} Neither the state nor the defense raised any concern to the trial court about the verdict forms. Accordingly, we may only act if there was plain error. Plain error requires a showing that (a) there was an error; (b) the error was plain, i.e., obvious; and (c) but for the error the outcome of the proceeding would have been the opposite of what occurred; and finally, (d) reversal is necessary to correct a manifest miscarriage of justice. *State v. Johnson*, 8th Dist. Cuyahoga No. 110904,

2022-Ohio-2136, ¶ 8.  Plain error should be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 63} "'If taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled.'" *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 28, quoting *State v. Tvaroch*, 2012-Ohio-5836, 982 N.E.2d 751, ¶ 21 (11th Dist).  Rather, "'misstatements and ambiguity in a portion of the instructions' only give rise to a reversal where the instructions are so misleading that they prejudicially affect a substantial right of the complaining party.'" *Id.*, citing *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012 Ohio 5233, ¶ 43, quoting *State v. Farr*, 3d Dist. Seneca No. 13-06-16, 2007-Ohio-3136, ¶ 14.

**Analysis**

{¶ 64} Specifically, Bouyer argues that by referring to other counts, the trial court asked the jury to make findings on multiple counts when determining Bouyer's guilt on a single count.  We disagree.  A review of the jury instructions helps clarify the issue.  For example, for Count 4, the instruction notified the jury that before they could find Bouyer guilty of sexual battery, they had to find beyond a reasonable doubt that between the dates on the indictment in Cuyahoga County, Ohio, Bouyer engaged in sexual conduct, "to wit: vaginal penetration (See Count 3) with J.D. not his spouse, DOB 12/23 2004."

{¶ 65} Based on our review of the jury instructions, we find that the trial court did not instruct the jury to make a finding on Count 3 to evaluate Count 4. We make a similar finding for the remaining verdict forms challenged by the defense. The court merely referred the jury to the conduct alleged in the other counts as a reference. We disagree with the defense that the instructions were so confusing as to amount to plain error.

{¶ 66} Furthermore, the jury did not express any confusion regarding the verdict forms. During deliberations, they posed two questions. First, the jury believed they needed an additional verdict form for the age of the victim in Counts 1, 2, and 5. The trial court responded that they should review the jury instructions and that they had received all the necessary forms. Second, the jury asked to see a section of the state's closing argument PowerPoint presentation regarding Count 19. The court responded that the jury had everything it needed to reach its verdict.

{¶ 67} Accordingly, the verdict forms were not so confusing as to require a finding of plain error. The third assignment of error is therefore overruled.

**Victim-Impact Testimony**

{¶ 68} In the fourth assignment of error, Bouyer argues that he was deprived a fair trial due to the admission of improper victim-impact testimony. Bouyer alleges that the introduction of this testimony was plain error. Specifically, Bouyer objects to testimony regarding J.D.'s deteriorating relationship with N.B., her mother, including her inability to see her new sibling or her dogs and her history of self-harm. Her family members were also permitted to testify about incidents of

self-harm, and her father Manny testified to her change in demeanor. Bouyer also points to portions of M.B.'s interview. In it, M.B. discussed incidents of self-harm, lack of appetite, failing in school, and skipping practices, as well as Bouyer's reaction to these incidents.

{¶ 69} Plain error review has previously been described. Plain error should be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

{¶ 70} Victim-impact testimony is an issue of relevancy. The impact of the crime on the victim is not a relevant fact, i.e., evidence having a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Evid.R. 401. Such testimony is usually irrelevant because it is immaterial to guilt or innocence and has a tendency to inflame the passion of the jury. *State v. Eisermann*, 8th Dist. Cuyahoga No. 100967, 2015-Ohio-591, ¶ 36. However, victim-impact evidence that "depicts both the circumstances surrounding the commission of the [offense] and also the impact of the [offense] on the victim's family may be admissible during both the guilt and the sentencing phases." *Id.*, quoting *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995) (referring to a homicide). Victim-impact evidence admitted in error "does not constitute reversible error unless the defendant shows there is some reasonable probability that the outcome would have been different." *State v. Freeman*, 8th Dist. Cuyahoga No. 92809, 2010-Ohio-3714, ¶ 45, citing *State v. Sova*,

8th Dist. Cuyahoga Nos. 71923 and 71924, 1998 Ohio App. LEXIS 1512 (Apr. 9, 1998).

{¶ 71} A good portion of the testimony from J.D. were Instagram and text messages between J.D. and her mother that were read into the record and then admitted as exhibits at the close of the state's case without objection (state's exhibits Nos. 4 and 5). In the messages, J.D. discussed how she felt about her mother's lack of support after she disclosed the sexual abuse. Additionally, B.D., K.D., and J.W. testified about incidents of self-harm. These three witnesses testified about self-harm in relation to J.D. disclosing the abuse. Finally, Manny testified that after filing the police report, J.D. would stay in her room all the time. It was hard for him to get her to come out. J.D. just wanted to lie in bed.

{¶ 72} Looking at the references to self-harm from J.D.'s family members, we find that their introduction was not an error. The information came to light during the testimony of the witnesses to whom J.D. disclosed her abuse. In trying to find out why J.D. was upset, K.D. learned J.D. was cutting herself. K.D.'s intuition told her that something else was going on, and when she asked, J.D. disclosed the abuse. As introduced, the evidence of self-harm was connected to the commission of the offense and the impact on the victim; therefore it was not introduced in error, a prerequisite to a finding of plain error. As the three family witnesses who testified about self-harm all participated in the disclosure of the abuse, it was not plain error for the trial court to allow the testimony.

{¶ 73} Manny's testimony regarding J.D.'s behavior after she filed the police report was arguably irrelevant victim-impact testimony. However, there is no reasonable possibility that the admission of this testimony changed the outcome of the trial. J.D. isolating herself was not the type of testimony that would inflame the jury's passion such that the jury would ignore the other evidence to make a finding of guilt. This testimony was harmless beyond a reasonable doubt.

{¶ 74} Finally, the text messages between J.D. and her mother, N.B., consisted almost entirely of a discussion about how J.D. felt about her mother's reaction and actions after J.D. disclosed her allegations. She discussed in detail how she felt as well as her reasons for not disclosing to anyone. As the state pointed out, the defense put the victims' credibility in issue during their opening statement.

{¶ 75} The defense suggested that it was incredible that neither J.D. nor M.B. disclosed the abuse to their therapist and that none of the girls showed signs of distress or acted out in any way that raised concern for a mandatory reporter. Furthermore, the defense stated that there was "not one witness" who could back up the victims' claims, that there was no medical or scientific evidence of the crimes, and that the victims never utilized cell phone cameras or video to back up their allegations. These statements directly challenged the credibility of the victims.

{¶ 76} When the defense attacks a victim's credibility in the opening statement, they create grounds for the state to introduce a prior consistent statement, i.e., a statement consistent with the declarant's testimony offered "to rebut an express or implied charge against declarant of recent fabrication or

improper influence or motive." Evid.R. 801(D)(1)(b).  The text messages introduced by the state served to rebut a charge that J.D. made these accusations based on some improper motive.  Accordingly, the statements were admissible, no error occurred, and the defense failed to establish their admission was plain error.

{¶ 77} Turning to M.B.'s interview, we have already determined that it was an error for the video to be shown to the jury.  However, the trial court's curative instruction and refusal to admit the video into evidence or allow the jury to have it during deliberations cured that error.  Nevertheless, we will review the video for this assignment of error.  A review of the video challenges the position that M.B.'s comments were victim-impact statements.  At the beginning of the interview, Hanrahan asked M.B. about school.  M.B. relayed she was in the tenth grade and that she had pretty good grades.  However, her grades had started slipping the previous quarter, and she was failing all her classes.  M.B. quit cheerleading and improved her grades.  In the video, M.B. is smiling and seems quite proud of herself for improving her grades.  She never disclosed what caused her grades to slip, other than to say she was going through some things.

{¶ 78} In response to questions about how she came to live with her father, M.B. relayed that there was a custody case.  After that, M.B. saw her mother on the weekends.  At some point, visits stopped.  M.B. relayed that Bouyer told her that he had obtained full custody.  When asked when she last saw her mother, M.B. stated her mother would come to her school.  When asked why, M.B. stated that she had

not been eating and that her mother would bring her food to the school. M.B. did not relay why she was not eating.

{¶ 79} Later in the interview, Hanrahan asked M.B. what prompted her to go to the police the previous day. M.B. went into a wide-ranging discussion starting with her father punishing her for having a phone. That conversation led to M.B. discussing all of the reasons she wanted to move in with her mother, including the fact that she did not get along with her stepmother, N.B. M.B. did not think N.B. was a good person. M.B. did not like how her stepmother addressed her struggles with school. As an example of why she did not care for N.B., M.B. explained that when N.B. learned M.B. was self-harming, N.B. made fun of her. M.B. then relayed that Bouyer yelled at her and punished her for self-harm. M.B. never said she harmed herself as a result of Bouyer's actions. Furthermore, M.B. noted that at the time of the interview, she had addressed the issue and no longer cut herself.

{¶ 80} These statements established background and addressed the circumstances M.B. was living in around the time that she made her accusations. At no time did M.B. indicate her actions were a result of Bouyer's criminal conduct.

{¶ 81} Accordingly, the fourth assignment of error is overruled.

## Record Used to Refresh Recollection

{¶ 82} In the fifth assignment of error, Bouyer argues that it was error for the state to refresh N.B.'s recollection on the record in front of the jury. The defense called N.B. as its sole witness. During cross-examination, the state questioned N.B. extensively regarding conversations between herself and Bouyer while he was in

custody. Those conversations were recorded as per the jail's policy. The state was permitted to refresh N.B.'s recollection of certain calls by playing the recordings in open court before the jury. Although the defense objected that the state had not authenticated the calls, they did not object to the state refreshing the witness's recollection in open court on the record. Accordingly, as the defense notes in its brief, we review this issue for plain error, i.e., whether there was an error, that was obvious; which, but for the error, the result of the proceedings would have been opposite of what occurred and that reversal is necessary to correct a manifest miscarriage of justice. *Johnson*, 8th Dist. Cuyahoga No. 110904, 2022-Ohio-2136, ¶ 8.

{¶ 83} Here it was clearly error for the state to refresh N.B.'s recollection in open court in front of the jury. An attorney refreshes a witness's recollection, after establishing that they do not remember a statement, by showing the witness the statement, and then allowing the witness to testify from "his present independent knowledge." *State v. Harris*, 8th Dist. Cuyahoga No. 110982, 2022-Ohio-4630, ¶ 33, citing *State v. Scott*, 31 Ohio St.2d 1, 285 N.E.2d 344 (1972). "The testimony of the witness is the evidence; the out-of-court statement is not placed before the jury." *Id.*, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 57; *see also* Evid.R. 612. The trial court's decision was contrary to law when it allowed the state to play the recordings in open court to refresh the witness's recollection. *See Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 37.

{¶ 84} Nevertheless, although there was an error, Bouyer needs to establish that but for the error the outcome of the proceedings would have been different. In the instant case, the state sought to introduce conversations between N.B. and Bouyer that contradicted her testimony on direct examination that she was neutral and had not taken a side in the situation between Bouyer and J.D. On the witness stand, N.B. explained the reasons for her statements. Nevertheless, the most salient point of N.B.'s testimony was that T.W.'s testimony was inaccurate because Bouyer was not living with her in the summer 2011. However, both T.W. and J.D. contradicted that assertion. The recordings were not the only evidence that called into question N.B.'s truthfulness on the stand. Given the foregoing, we cannot say that the outcome of the trial would have been different if the objectionable statements had not been played for the jury.

{¶ 85} Accordingly, the fifth assignment of error is overruled.

**Bolstering the Victim's Testimony**

{¶ 86} In the sixth assignment of error, Bouyer argues that he was denied a right to a fair trial when witnesses were permitted to testify about their belief in the truthfulness of the victim.

{¶ 87} The determination of the veracity of a witness is the province of the trier of fact, not an expert or lay witness. *State v. Preston*, 8th Dist. Cuyahoga No. 109572, 2021-Ohio-2278, ¶ 65. "Opinion testimony regarding another witness's credibility 'infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility.'" *Id.*, quoting *State v. Eastham*, 39 Ohio

St.3d 307, 312, 530 N.E.2d 409 (1988). Such evidence is inadmissible. *Id.* However, the rule only applies to testimony that directly supports the veracity of the victim. *State v. Denson*, 1st Dist. Hamilton No. C-220208, 2023-Ohio-847, ¶ 2, citing *State v. Cashin*, 10th Dist. Franklin No. CA2008-11-138, 2009-Ohio-6419, ¶ 20. "[I]ndirect bolstering of a victim's credibility is not the same as the direct rendering of an opinion as to a victim's veracity." *Id.*

{¶ 88} We have already addressed M.B.'s videotaped interview and will not do so again. It was not introduced into evidence, and we presume that the jury followed the trial court's instruction not to consider it. Accordingly, we turn to the other testimony that Bouyer claims was improper. Bouyer takes issue with the testimony of J.D.'s family members and her ex-boyfriend and argues that it was an error for those witnesses to testify about J.D.'s disclosures of her abuse. However, none of these witnesses testified that, in their opinion, J.D. was being truthful; they simply relayed their version of what happened when J.D. disclosed the abuse to them. Although this testimony served to indirectly bolster J.D.'s credibility, none of it directly supported her veracity. Additionally, because Bouyer did not object to these statements, he must establish that their admission was plain error, i.e., that there was an error that affected the outcome of the trial. He has failed to do so.

{¶ 89} Finally, Bouyer argues that text messages from M.B. to J.D. in which she stated she believed her were inadmissible. Similarly, M.B. testified that she believed J.D. In the text messages to J.D., M.B. repeatedly told J.D. that she believed her and that she was sorry for not saying anything earlier. J.D. was initially

suspicious and asked M.B. why she believed her now.  M.B. disclosed that she always

believed J.D. and then told her some of the things Bouyer had done to her.

{¶ 90} During her testimony, M.B. was questioned as follows:

State: To this day, do you know what [J.D.] has said happened to her?

M.B.: No.

State: What were your thoughts when [J.D.] disclosed and this stuff was happening to you?

M.B.  I didn't know what to believe because I ain't know what was happening to her.  And I believed some stuff because I knew it was happening to me.

{¶ 91} The fact that M.B. believed J.D. was irrelevant and inadmissible.

However, again, Bouyer has failed to establish that but for this error the outcome of

the trial would have been different under plain error review.

{¶ 92} Accordingly, the sixth assignment of error is overruled.

**Sufficiency of the Evidence for Count 4:  Sexual Battery**

{¶ 93} In the seventh assignment of error, Bouyer argues that there was

insufficient evidence to support the conviction for sexual battery of J.D. under Count

4.  Specifically, Bouyer alleges that there was insufficient evidence of penetration as

required to establish sexual battery.

{¶ 94} "A challenge to the sufficiency of the evidence supporting a conviction

requires a determination of whether the state met its burden of production." *State*

*v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v.*

*Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).  Sufficiency of the

evidence involves a review of the evidence admitted at trial and a determination of

"'whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Goins*, 8th Dist. Cuyahoga No. 109497, 2021-Ohio-1299, ¶ 13, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. We must determine, "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* The question is not "'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'" *Id.*, quoting *Thompkins* at 390.

{¶ 95} In order for Bouyer to be convicted of sexual battery, the state had to prove beyond a reasonable doubt that Bouyer did engage in sexual conduct with J.D., DOB 12/23/2004, not his spouse, when the offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person. R.C. 2907.03(A)(5). The only element in dispute is whether Bouyer engaged in "sexual conduct" with J.D. The Ohio Revised Code defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 96} When asked about this incident, J.D. testified as follows:

J.D.   I forgot what the conversation was or how it lead [sic] up to it, but I ended up laying down and he ended up going to his dresser and grabbing a condom.  And he told me to pull my pants down, and he pulled his pants down to his knees, and he put the condom on and he pressed his penis against my vagina.

* * *

State: When you say his penis was pushed into your vagina, was the outside of his penis against the skin of your vagina?

J.D.:  Yes.

State: Okay.  What do you feel?

J.D.:  Pain, pressure.

State: What — do you tell him anything?

J.D.:  I told him to stop because it hurt.

State: And what did he say?

J.D.:  He stopped.

{¶ 97} Bouyer argues that this testimony was insufficient to establish penetration, and therefore, the conviction on Count 4 should be overturned. However, the case law in this jurisdiction and others fails to support this argument. In a similar case, this court found that the evidence was sufficient to find penetration where an eight-year-old victim testified that the defendant tried to put his penis into her vagina but could not because the victim would close her legs, allowing him access only to the outer part of her vagina.  This court noted:

> The law is contrary to appellant's argument that he did not have vaginal intercourse because he did not penetrate the victim when he placed his penis on the outside of the victim's vagina.  This court, as well as others, have consistently held that evidence of slight penetration, entering the

vulva or labia, is sufficient to support a rape conviction. *State v. Blankenship*, 8th Dist. Cuyahoga No. 77900, 2001 Ohio App. LEXIS 5520 (Dec. 13, 2001); *see* e.g., *State v. Nivens*, 10th Dist. Franklin No. 95 APA09-1236, 1996 Ohio App. LEXIS 2245 (May 28, 1996); *State v. Carpenter*, 60 Ohio App.3d 104, 105, 573 N.E.2d 1206 (5th Dist. 1989). * * *. Here, there was sufficient evidence that could lead a rational trier of fact to conclude that appellant penetrated the victim by placing his penis on the outside of the victim's vagina.

*State v. Falkenstein*, 8th Dist. Cuyahoga No. 83316, 2004-Ohio-2561, ¶ 16

{¶ 98} Accordingly, there was sufficient evidence presented for a jury to find Bouyer guilty of sexual battery beyond a reasonable doubt. The seventh assignment of error is therefore overruled.

## Sexually Violent Predator Specification Hearing

{¶ 99} Finally, in the eighth assignment of error, Bouyer argues that it was error for the trial court to find him guilty of a sexually violent predator specification where it failed to hold a hearing on the matter and the state failed to present any evidence to support the finding.

{¶ 100} After polling the jury as to their verdict on the underlying counts, the court noted:

At the time the defense renewed their Rule 29 motion I did hold that renewed motion in abeyance. That motion is denied based on the evidence presented in this trial, and I'm prepared to issue a verdict on the sexually violent predator specifications.

Mr. Bouyer waived the specifications found in Counts 1 through 14 – 1 through 12. At this time, I am making a finding of guilt on all 12 sexually violent predator specifications.

{¶ 101} The defense did not object when the trial court immediately announced its verdict on the sexually violent predator specifications, nor did they

request that the trial court conduct a hearing. Furthermore, the defense has not argued in its brief before this court that the trial court's actions amounted to plain error entitling Bouyer to a reversal of those convictions.

{¶ 102} Where an appellant fails to object before the trial court, waiving all but plain error, and fails to raise plain error on appeal, this court is not required to address the assigned error. *State v. Body*, 8th Dist. Cuyahoga No. 109388, 2021-Ohio-703, ¶ 23.

{¶ 103} Accordingly, the eighth assignment of error is overruled.

{¶ 104} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

ANITA LASTER MAYS, A.J., and
MARY EILEEN KILBANE, J., CONCUR