[Cite as *State v. Centers*, 2026-Ohio-451.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                         :

    Plaintiff-Appellee,          :

                                        No. 115050

    v.                           :

JOHN CENTERS, SR.,                     :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 12, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-693980-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Samantha Sohl and Elle English, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

WILLIAM A. KLATT, J.:

{¶ 1} Defendant-appellant John Centers, Sr. ("Centers") appeals from his convictions for rape and other charges. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} This case arose from a July 22, 2024 incident in which the victim, R.S., alleged that Centers sexually assaulted her. R.S. is engaged to Centers's son, Jay, and the couple live together with Centers in his home in Garfield Heights, Ohio.[1]

{¶ 3} On August 9, 2024, a Cuyahoga County Grand Jury indicted Centers on one count of rape in violation of R.C. 2907.02(A)(2); one count of kidnapping in violation of R.C. 2905.01(A)(4); and two counts of gross sexual imposition in violation of R.C. 2907.05(A)(1). The rape charge carried notice of prior conviction, repeat violent offender, and sexually violent predator specifications; the kidnapping charge carried sexual motivation and sexually violent predator specifications.

{¶ 4} On January 2, 2025, the State filed a motion in limine related to body-camera evidence. On January 5, 2025, Centers filed an objection to the State's motion in limine.

{¶ 5} On January 8, 2025, Centers executed a waiver of his right to a jury trial. On January 10, 2025, the matter proceeded to a bench trial.

{¶ 6} The State called R.S., who testified that she and her fiancé Jay lived with Jay's father, Centers, in Centers's house in Garfield Heights, Ohio. R.S. testified that in the morning on July 22, 2024, Jay left the house at around 7:30 a.m. because he had to be at work at 8 a.m. R.S. testified that another relative who lived in the

---

[1] Jay also goes by John and is referred to by both names throughout the record. For clarity, we will refer to him in this opinion as Jay.

house, Mike Centers ("Mike"), was also at work all day.[2]  R.S. testified that her daughter, R., was at R.'s grandmother's house that day because R.S. had not been feeling well.

{¶ 7}  R.S. testified that she was sleeping for most of the day in her bed in the basement of the house.  R.S. testified that around 3:30 p.m., she went upstairs to get a glass of water.  According to R.S., Centers was on the other side of the kitchen and came up behind R.S., pushed her against the refrigerator, and began touching her.  R.S. testified that Centers took his left hand and started touching her, first on top of her clothes, before putting his hand inside her shorts, touching her vagina, and digitally penetrating her.  R.S. testified that Centers also began kissing her neck and used his other hand to touch her breasts.  According to R.S., she was "in the fight-or-flight mode and [she] just froze up." (Tr. 44.)

{¶ 8}  R.S. testified that she called for her dog, who came up the stairs, and upon seeing the dog, Centers "backed up off" R.S.  (Tr. 45.)  R.S. went to the basement, retrieved her phone, and left the house with her dog.  R.S. testified that she went to the home of April Aiello ("Aiello"), Jay's mother, which was approximately a 15-minute walk from Centers's house.  R.S. testified that she was unable to call anyone because her phone was shut off and she needed Wi-fi to make a call; she testified that she was afraid to stay at Centers's house, Aiello was a source of support, and she could use Aiello's phone to call Jay at work.

---

[2] Mike is Centers's brother.

{¶ 9} R.S. testified that several minutes after leaving the house, she saw Centers coming towards her. R.S. continued walking to Aiello's house with Centers following her. Upon arriving at Aiello's house, R.S. went inside and told Aiello what was happening. R.S. testified that Aiello went outside to tell Centers to leave and then came back inside and asked R.S. if she wanted to take a shower. R.S. testified that she showered at Aiello's house and changed into clean clothes that Aiello gave her. According to R.S., she could not call Jay because Jay's phone was off, but Aiello called Jay's workplace to let him know that he should come directly to Aiello's house after work. R.S. testified that in the meantime, she stayed at Aiello's house and watched television.

{¶ 10} According to R.S., that evening, Jay and Mike arrived at Aiello's house to get her; Jay took Mike to Centers's house, and then Jay and R.S. proceeded to the Garfield Heights police station.

{¶ 11} R.S. made a police report; the State introduced body-camera footage from the officer who took R.S.'s statement and played it during her testimony. The State sought to introduce this footage as a prior consistent statement of R.S. to rebut defense counsel's allegations during opening statements and cross-examination of R.S. that she was fabricating her allegations against Centers. The court admitted the body-camera footage over defense counsel's objection.

{¶ 12} The State also called Amanda Perfetto ("Perfetto"), who testified that she was the sexual-assault nurse examiner ("SANE nurse") who administered a rape kit, collecting DNA swabs from R.S. after the incident. Perfetto testified that as part

of her examination of R.S., she asked whether R.S. had showered or used the bathroom since the incident; Perfetto explained that showering has "been noted to erase some DNA." (Tr. 107.) Perfetto also testified that her examination of R.S. revealed some vaginal bleeding.

{¶ 13} The State then called Sergeant John O'Meara ("O'Meara"), who testified that in his employment with the Cuyahoga County Sheriff's Department, he oversaw jail investigations. O'Meara testified that related to this case, he reviewed call logs made by Centers when he was an inmate at the Cuyahoga County Jail. During O'Meara's testimony, the State played audio recordings of phone calls made by Centers. O'Meara confirmed that these calls were made by an inmate that used Centers's identification number and identified himself as Centers, and defense counsel stipulated that the calls were made by Centers.

{¶ 14} The State called Lieutenant Todd Cramer ("Cramer"), who testified that he was employed as a detective at the Garfield Heights Police Department. Cramer testified that on July 22, 2024, he was contacted related to this case and went into the station. Cramer testified that at the station, he learned that R.S. was the alleged victim who had named Centers as the suspect. The same day, an arrest warrant was issued for Centers, and Centers was arrested and taken into custody. Cramer testified that as part of his investigation, he collected R.S.'s rape kit from the hospital, collected buccal swabs from Centers, sent both to the Bureau of Criminal Investigation ("BCI"), and reviewed the BCI report. Cramer testified that there was insufficient DNA evidence in the case to aid in his investigation.

**{¶ 15}** Cramer testified that he contacted R.S. to obtain a statement from her. According to Cramer, he was able to reach R.S. by phone one time, but he was not able to obtain a statement from her or set up a meeting with her. Cramer also contacted Aiello, who provided an oral statement that was consistent with R.S.'s version of events. Finally, Cramer testified that the journey from Centers's house to Aiello's house would have taken upwards of 45 minutes on foot. Finally, Cramer testified that he interviewed Centers as part of his investigation.

**{¶ 16}** The State also called Officer Jacodimus Lee ("Lee"), who testified that he worked as a police officer at the Garfield Heights Police Department. Lee testified that on July 22, 2024, he took a report from R.S. in the lobby of the Garfield Heights police station. Lee described R.S.'s demeanor as "crying, distraught, highly upset" and said that she "[h]ad to be calmed down a few times before she talked to me." (Tr. 159.) Lee confirmed that his body-camera footage accurately reflected his interaction with R.S. and Jay. Lee testified that he did not observe anything that would indicate that R.S. was under the influence of drugs or alcohol when she reported the sexual assault.

**{¶ 17}** At the close of the State's case, defense counsel made a Crim.R. 29 motion for acquittal. The court denied this motion.

**{¶ 18}** Centers called three witnesses on his behalf. First, Centers called Lane Centers ("Lane"), who testified that Centers was her son. Lane testified that Centers "drinks and he does drugs once in a while, and he runs around with . . . crack whores." (Tr. 171-172.) Lane also testified that her grandson and R.S. shared an

infant daughter, R., and Lane identified herself as R.'s primary caretaker and testified that she takes care of R. "most of the time." (Tr. 172.)

{¶ 19} Lane testified that on the morning of the incident in this case, she had taken Centers to a doctor's appointment for a follow-up appointment related to a recent jaw surgery. Lane testified that she took Centers to his house, they arrived at around 3 p.m., and as she was pulling out of the driveway, R.S. came running outside and approached her car, saying, "John can't find the drugs and he thinks they might be in your car." (Tr. 175.) Lane also testified that she did not like R.S. and that R.S. has an anger problem.

{¶ 20} During the State's cross-examination of Lane, it played the audio recording of one of the jail calls that Centers made to Lane in which Centers says to Lane that "they might be listening to us get our stories together" and tells Lane to make sure that Aiello knows how to testify. (Tr. 188.) Lane acknowledges that Centers made this statement but testified that the conversation was merely to refresh her memory about dates and times and to tell her son that it might be imprudent to bring up drugs, rather than to fabricate a story.

{¶ 21} Centers also called Aiello to testify on his behalf. Aiello testified that she has known Centers for approximately 35 years and shared a son, Jay, with him; Aiello and Centers were previously in a romantic relationship but at the time of the trial in this case, they had been split up for over 25 years. Aiello described Centers as a "great guy" and also testified as to his drug use and other illicit activity in the following exchange:

DEFENSE COUNSEL: Well, have you known him, when he's using drugs, to pick up girls or party with the girls or anything like that?

AIELLO: Well, he's called me a few times and told me, but they were all somebody that was willing to do it with him and he paid them. I mean, he's called me a couple times, asked if I wanted to party with him just so he would be with somebody he knew, and I, you know —

DEFENSE COUNSEL: Do you know whether he — would he pay them with money or drugs or both?

AIELLO: That, I never really got into it with them.

DEFENSE COUNSEL: But he's admitted that he picks up girls —

AIELLO: Yes.

DEFENSE COUNSEL: — and does whatever?

AIELLO: Yes.

(Tr. 200-201.)

{¶ 22} With respect to R.S., Aiello testified that R.S. was her son's girlfriend, and Aiello never really got along with her. Aiello testified that on the date of the incident, R.S. and Centers arrived at her house together, but Aiello did not initially realize that Centers was there because he did not come to the door. Aiello testified that R.S. and her dog came to Aiello's back door and began banging on the door, and R.S. was not out of breath or crying. According to Aiello, she asked R.S. what was wrong and R.S. asked her to tell Centers to leave. Aiello testified that nothing in R.S.'s demeanor indicated that anything was wrong, and when Aiello confronted Centers, they greeted each other and "he looked like he was tired, but that was it." (Tr. 204). Aiello testified that Centers asked if she could give him a ride home because he claimed to have walked R.S. to Aiello's house to make sure she was safe.

Aiello declined because she was waiting for her boyfriend to pick her up, so Centers walked home.

{¶ 23} Aiello testified that when she went back inside, R.S. was leaning against the kitchen sink and started "huffing and puffing, like trying to hyperventilate herself" or "trying to coerce an emotion." (Tr. 205). According to Aiello, when R.S. told her what had happened, Aiello offered R.S. her phone to call the police or to give her a ride to the hospital, but R.S. declined both offers. Aiello testified that it would take about 30 to 40 minutes to walk from Centers's house to her house.

{¶ 24} Finally, Centers testified on his own behalf. Centers acknowledged that he has a history of drug use and of exchanging money and drugs for sex. According to Centers, he first met R.S. about three years prior to trial, when she and Jay first started dating. At that time, Jay sent R.S. to Centers's house to fix her car. According to Centers, he did not fix R.S.'s car, but they exchanged phone numbers and began texting each other. Centers testified that about a week after their initial meeting, R.S. came over again so that Centers could fix Jay's truck. According to Centers, when R.S. came over, he was upstairs at his house "getting high" and R.S. proceeded to join him and then the two of them engaged in oral sex.

{¶ 25} Centers testified that Jay and R.S. moved into his house in April 2024. Centers also testified that in addition to letting Jay and R.S. stay at his house, he paid the bills, bought groceries, and supplied them with drugs. Centers testified that while Jay and R.S. were living in his house, Centers and R.S. would regularly do

drugs and engage in sexual activity. Centers also testified that he, R.S., and Jay would do drugs together. Centers testified that about two weeks prior to the incident at issue in this case, he told R.S. and Jay that they had to leave his house because he resented them for staying with him for free.

{¶ 26} With respect to July 22, 2024, Centers testified that he got home from his doctor's appointment in the afternoon and R.S. got a phone call "that her car broke down and she was supposed to go to [Aiello's] or [Aiello] would take her to get her — to get the car." (Tr. 226.) According to Centers, he told R.S. to wait and while she began walking down the street, he got drugs for them and proceeded to meet up with her. Centers testified that they walked to Aiello's, smoking marijuana together on the way. Centers testified that he had no idea that R.S. was going to make any accusations against him and he only found out about the accusations from Lane later that evening.

{¶ 27} With respect to R.S.'s specific allegations that Centers pushed and held her against the refrigerator while he assaulted her, Centers testified that because of his recent surgery — in which he had screws and steel plates put in his jaw — R.S. "could have just smacked me" and "all she had to do was headbutt me or smack me and all this would have been broke." (Tr. 229.)

{¶ 28} During the State's cross-examination of Centers, it played a portion of his interview with Cramer, in which Centers denied having any sexual relationship with R.S. prior to the incident in question.

{¶ 29} At the close of the defense's case, defense counsel introduced one exhibit — a Facebook message from R.S. stating, "He thinks he's going to win. But little does he know, I've already won."

{¶ 30} Defense counsel renewed its Crim.R. 29 motion for acquittal, and the court denied the motion.

{¶ 31} On January 28, 2025, the court returned a verdict of guilty on all counts and specifications, with the exception of the sexually violent predator specifications discussed below.

{¶ 32} On February 25, 2025, the court held a hearing on the sexually violent predator specifications attached to the rape and kidnapping convictions. After hearing testimony from two witnesses, the court found Centers not guilty of the sexually violent predator specifications. The court referred Centers for the preparation of a presentence-investigation report.

{¶ 33} On March 25, 2025, the court held a sentencing hearing. The court notified Centers that he was classified as a Tier III sex offender and explained the registration requirements that accompany that classification. The assistant prosecuting attorney addressed the court and asked the court to impose a maximum sentence; the State conceded that the rape and kidnapping convictions would merge for sentencing and elected to proceed to sentencing on the rape conviction. Defense counsel and Centers also addressed the court.

{¶ 34} The court sentenced Centers to five to seven and one-half years in prison for the rape conviction and 18 months on each of the gross-sexual-imposition

convictions. The court ordered the sentences to be served concurrently, for a total sentence of five to seven and one-half years.

{¶ 35} Centers appealed. He now raises four assignments of error for our review:

> I. The trial court erred by admitting inadmissible hearsay over appellant's objection.
>
> II. The trial court erred by failing to merge allied offenses of similar import.
>
> III. Appellant's convictions are against the manifest weight of the evidence.
>
> IV. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish the elements necessary to support the convictions beyond a reasonable doubt.

For ease of discussion, we will address the assignments of error out of order.

**Law and Analysis**

**I. Hearsay**

{¶ 36} In Centers's first assignment of error, he argues that the trial court erred by admitting inadmissible hearsay over his objection. Specifically, Centers argues that the trial court improperly admitted hearsay statements made by R.S. when it allowed the State to introduce Lee's body-camera footage of R.S. making the report against Centers at the police station.

{¶ 37} The admission or exclusion of evidence is a matter left to the trial court's sound discretion and therefore will not be disturbed absent an abuse of discretion. *State v. Simmons*, 2013-Ohio-1789, ¶ 18 (8th Dist.), citing *State v. Frazier*, 2012-Ohio-1198, ¶ 17 (8th Dist.). An abuse of discretion occurs when a

court exercises its discretion in an unwarranted way in regard to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 38} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally statements made outside of the courtroom, offered at trial to prove the truth of what they assert, are inadmissible "hearsay" unless an exception applies. *State v. Black*, 2019-Ohio-4977, ¶ 20 (8th Dist.), citing *State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987); *State v. Williams*, 2018-Ohio-4612, ¶ 32 (8th Dist.); Evid.R. 802. However, this error does not necessarily require reversal of the outcome of the trial if it was harmless. *State v. Simmons*, 2013-Ohio-1789, ¶ 18 (8th Dist.), citing *Arizona v. Fulminante*, 499 U.S. 279, 306-309 (1991).

{¶ 39} Evid.R. 801(D)(1)(b) provides that a statement is not hearsay and is therefore admissible if it is a prior statement by a witness that is "consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive[.]" This rule applies only to statements that were made prior to the motivation to fabricate. *Black* at ¶ 24, citing *State v. Miller*, 2014-Ohio-3907, ¶ 73 (8th Dist.).

{¶ 40} Our review of the record reflects that defense counsel's theory of the case was that R.S. lacked credibility and fabricated the allegations against Centers to continue staying in his house. In accordance with this theory, defense counsel

made repeated references to R.S.'s lack of credibility during opening statements and cross-examination.

{¶ 41} "When the defense attacks a victim's credibility in the opening statement, they create grounds for the state to introduce a prior consistent statement" pursuant to Evid.R. 801(D)(1)(b). *State v. Bouyer*, 2023-Ohio-4793, ¶ 76 (8th Dist.). Here, the introduction of the body-camera footage during R.S.'s testimony showing her at the police station served to rebut a charge that R.S. made these accusations based on an improper motive.

{¶ 42} Centers's argument is centered on the timing of the statements shown on the body-camera footage. Specifically, Centers asserts that R.S. had the motivation to lie prior to making the statement in question. In support of this assertion, Centers points to his own testimony that he had told R.S. that she would have to leave his house two weeks before the incident. The trial court, as the trier of fact, was "'free to believe all, some, or none of the testimony of each witness appearing before it.'" *State v. Robertson*, 2018-Ohio-2934, ¶ 35 (8th Dist.), quoting *State v. Malone*, 2015-Ohio-2150, ¶ 29 (8th Dist.), citing *State v. Ellis*, 2013-Ohio-1184, ¶ 18 (8th Dist.). Here, our review of the record indicates that the trial court was generally unpersuaded by Centers's testimony. The trial court was not required to accept Centers's testimony as to R.S.'s motivation to lie as credible. Without Centers's testimony that he told R.S. she would need to leave the house two weeks prior to the incident, there is no evidence in the record supporting Centers's argument that R.S.'s motive to fabricate the allegations existed before she made her

statements at the police station. Moreover, in a bench trial, "the judge is presumed capable of disregarding improper hearsay evidence, and unless it is demonstrated that the court relied on inadmissible hearsay, a conviction will not be reversed." *State v. Crawford*, 2013-Ohio-1659, ¶ 61 (8th Dist.), citing *In re Sims*, 13 Ohio App.3d 37, 41 (12th Dist. 1983). Here, even if the evidence in question was inadmissible hearsay, Centers has not demonstrated that the trial court relied on the evidence in finding him guilty. Therefore, the trial court did not abuse its discretion in admitting this evidence as a prior consistent statement pursuant to Evid.R. 801(D)(1)(b).

{¶ 43} Further, to the extent that Centers's argument here relates to the Facebook message R.S. sent during the pendency of the case, even if this message constitutes evidence of R.S.'s motivation to fabricate her allegations, it has no bearing on the admission of the body-camera footage. The statements R.S. made on the body-camera footage occurred before the Facebook message.

{¶ 44} Therefore, the trial court's admission of the body-camera footage was not an abuse of discretion. Centers's first assignment of error is overruled.

## II. Merger

{¶ 45} In Centers's second assignment of error, he argues that the trial court erred when it failed to merge allied offenses of similar import for sentence. Specifically, Centers argues that his convictions for rape and gross sexual imposition were allied offenses of similar import and should have merged for sentencing.

**{¶ 46}** Appellate courts review whether offenses are allied offenses of similar import under a de novo standard. *State v. Sims*, 2024-Ohio-5699, ¶ 28 (8th Dist.), citing *State v. Williams*, 2012-Ohio-5699, ¶ 28. "'The defendant bears the burden of establishing entitlement to the protection provided by R.C. 2941.25.'" *Id.* at ¶ 86, quoting *State v. Davids*, 2022-Ohio-2272, ¶ 43 (8th Dist.). Here, because it is undisputed that Centers failed to preserve the issue of merger at trial, we review the issue for plain error. *State v. Bailey*, 2022-Ohio-4407, ¶ 7, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 28 ("The failure to raise the allied offense issue at the time of sentencing forfeits all but plain error.").[3]

**{¶ 47}** R.C. 2941.25 governs whether offenses are subject to merger and states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 48}** Under this statute, courts will consider three separate factors to determine whether the offenses are subject to merger: the import, the conduct, and the animus. *State v. Bey*, 2025-Ohio-740, ¶ 86 (8th Dist.), citing *State v. Ruff*, 2015-

---

[3] As mentioned above, the issue of merger came up at sentencing with respect to the rape and kidnapping charges. Defense counsel made no argument that the rape and gross-sexual imposition charges were allied offenses of similar import, as he argues here.

Ohio-995, paragraph one and three of the syllabus. Specifically, "offenses do not merge, and a defendant may be convicted of and sentenced for multiple offenses if any one of the following is true: (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Id.*, citing *Ruff* at paragraph three of the syllabus.

{¶ 49} Relevant to this assignment of error, Centers was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(1), which refers to "sexual contact," defined in R.C. 2907.01(B) as "any touching of an erogenous zone . . . for the purpose of sexually arousing or gratifying either person."

{¶ 50} Centers argues that Count 3, gross sexual imposition for touching R.S.'s vagina, is an allied offense to Count 1, rape via digital penetration, because both counts "involved a single action in a single incident to the same part of the body." Our review of the record reflects that R.S. testified that Centers came up behind her, pushed her against the refrigerator, and began touching her vagina on the outside of her clothes. Centers then began rubbing her under her clothes, before ultimately digitally penetrating her. Thus, the gross-sexual-imposition offense was completed when Centers touched R.S.'s vagina and constituted conduct separate and distinct from the rape. *See State v. Hilton*, 2008-Ohio-3010, ¶ 84 (8th Dist.). Under these facts, the rape and gross-sexual-imposition offenses were not allied offenses of similar import. Centers's second assignment of error is overruled.

### III. Sufficiency of the Evidence

{¶ 51} In Centers's fourth assignment of error, he argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal because the State failed to present sufficient evidence to support his convictions. Specifically, Centers argues that the only evidence presented in support of his convictions was testimony from R.S., and according to Centers, R.S. lacked credibility and was unable to testify with certainty about the events in question.

{¶ 52} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 53} With a sufficiency inquiry, an appellate court does not review whether the prosecution's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 36 (Cook, J., concurring). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at ¶ 23. Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and

all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.).

{¶ 54} With respect to the rape conviction, Centers argues that R.S. did not mention digital penetration to the SANE nurse and only specified during her trial testimony that Centers digitally penetrated her. Further, he argues that R.S.'s trial testimony is insufficient to establish the elements of rape, beyond a reasonable doubt, because R.S. included qualifying language in her testimony. Centers is referring to R.S.'s testimony that "at one point I want to say about half of an inch of his finger — two of his fingers go inside me." (Tr. 43-44.)

{¶ 55} To the extent that Centers's argument is premised on minor inconsistencies between her statement to the SANE nurse and her trial testimony, it is irrelevant to a sufficiency analysis. Further, Centers's argument that R.S.'s testimony was uncertain is not well-taken. It is well-established that "[t]he testimony of one witness, if believed by the factfinder, is enough." *In re C.A.*, 2015-Ohio-4768, ¶ 51 (8th Dist.), citing *State v. Adams*, 2014-Ohio-4233, ¶ 14 (5th Dist.) ("The testimony of one witness, believed by the [trier of fact], is sufficient to establish a fact in question."). The record reflects that R.S. testified that Centers digitally penetrated her vagina, and the factfinder—the court—stated that it believed R.S.'s testimony. The fact that R.S.'s testimony was possibly unclear as to the depth of penetration or the number of fingers does not mean that the rape conviction was supported by insufficient evidence.

{¶ 56} With respect to the kidnapping conviction, Centers argues that the State presented insufficient evidence that he forcibly restrained R.S. in order to engage in sexual activity against her will. In support of this argument, Centers points to R.S.'s testimony that Centers could barely walk on the day in question; Centers thus concludes that it is "implausible" that he could have overpowered R.S.

{¶ 57} Our review of the record reflects that R.S. testified that Centers forcibly pushed her against the refrigerator and grabbed her, using his body to block her from moving. This is sufficient to show that Centers restrained R.S.'s liberty as required to support his kidnapping conviction.

{¶ 58} For these reasons, viewing the evidence in the light most favorable to the State as we are required to do, Centers's convictions were supported by sufficient evidence. Centers's fourth assignment of error is overruled.

## IV. Manifest Weight of the Evidence

{¶ 59} In Centers's third assignment of error, he argues that his convictions were against the manifest weight of the evidence. Specifically, Centers again emphasizes that R.S.'s testimony was the main evidence in support of his convictions and her testimony was not credible. Centers asserts that his interaction with R.S. was consensual and that she had a clear motivation to lie about their relationship. We disagree.

{¶ 60} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect

in inducing belief.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins*, 1997-Ohio-52, at ¶ 24.

{¶ 61} "'When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt.'" *State v. Travis*, 2022-Ohio-1233, ¶ 28 (8th Dist.), quoting *State v. Worship*, 2022-Ohio-52, ¶ 34 (12th Dist.), quoting *State v. Tranovich*, 2009-Ohio-2338, ¶ 17 (12th Dist.). "'A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which evidence weighs heavily against conviction."'" *Id.*, quoting *State v. Crenshaw*, 2020-Ohio-4922, ¶ 23 (8th Dist.), quoting *State v. Thompkins*, 1997-Ohio-52, ¶ 25.

{¶ 62} While we acknowledge that R.S. may have had a motivation to lie, this does not mean that the court clearly lost its way and created a manifest miscarriage of justice. Moreover, the record reflects that the arguments Centers is making in support of this assignment of error were fully addressed at trial. R.S. was extensively cross-examined at trial, and Centers presented multiple witnesses who testified as to her character and his own; the court heard and considered all this evidence.

{¶ 63} Following a thorough review of the record, we cannot conclude that this is a case in which the trier of fact lost its way and created such a manifest miscarriage of justice that the convictions must be reversed. Therefore, Centers's

convictions are not against the manifest weight of the evidence and his third assignment of error is overruled.

**{¶ 64}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
WILLIAM A. KLATT, JUDGE*

SEAN C. GALLAGHER, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)